TERRITORY v. DURAN and another.

January Term, 1884.

WITNESS—COMPETENCY—UNEDUCATED DEAF MUTE.
   A deaf and dumb child, who has never been educated in the deaf and dumb language, who cannot be made to understand anything of the nature of an oath, and who can do nothing more than give an account by signs only of what he saw, without affording any means of examination or cross-examination, is not a competent witness, especially in a capital case. BRISTOL, J., dissenting.

*Wm. Breeden,* Atty. Gen., for the Territory.

BELL, J.   The defendants in the court below, and appellants here, were indicted, tried, and convicted of the crime of murder in the first degree, at the July term of the district court for Grant county, for 1883.   The bill of exceptions is submitted to this court without argument.   The defendants were indicted for the murder of a Chinaman by the name of Wy Poi, alleged to have been killed by them on the third day of February, 1883, in the evening of that day.   Numerous exceptions were taken by counsel for the defendants in the court below, but it will be unnecessary for us to consider more than one of them.

The principal witness offered for the prosecution at the trial was a deaf and dumb child, who, at the time of the commission of the offense, was less than nine years of age, and at the time of the trial was but little more than nine years old.   He was the only witness offered, who, it was claimed, had been an eye witness to the commission of the offense.   Objection was made to his competency as a witness, both for the reason that he was so young a child, and that his physical infirmities were such as to make it impossible for him to intelligently narrate the occurrences which it was claimed he had witnessed.   It was also claimed, that the child being wholly uneducated in the language of the deaf and dumb, that it was not possible for him to understand such questions as might be put to him touching the transaction.   These objections were all overruled by the presiding judge in the court below, and exceptions were duly noted.

From the record it appears that the mother of the deaf and dumb

boy, Luther Carey, was called, and sworn to act as an interpreter for the child. She testified in substance that he never had been educated in the deaf and dumb language, but that she could make herself understood to him by signs, and that generally she could understand him. The court asked her this question: *Question.* "Ask him [the deaf and dumb boy] what will be done to him if he should tell an untruth as a witness here,—if he should tell a lie while he is giving his. testimony, what would be done to him?" Here, the record shows, Mrs. Carey made several signs and gestures to the deaf mute with her hands. *Answer.* "I cannot make him understand." *Q.* "You say you cannot make him understand?" *A.* "No sir; I cannot. He has. the idea of the murder fixed in his mind, and he wants to tell that." *Q.* "Can you convey to him an idea that he will be punished if he does not testify truly?" Here the witness again repeats the signs and gestures to the mute. *A.* "I cannot make him understand me; he is telling how the murder was committed, and what he saw. He thinks he is wanted to tell what took place at the Chinaman's house; that night."

It is very evident from the testimony of the mother and brother of the deaf mute that their only knowledge of what he said to them was. inferential, and based upon their familiarity with his signs and gestures, and only extended to the most ordinary every-day affairs of life; that no exact code of conversation existed between them, but that in a limited way they understood his gestures and pantomime in their reference to his every-day wants. The court, however, admitted the testimony of the child, and in doing so, used the following. language:

"This little boy has no education, yet I am inclined to believe that, notwithstanding the fact that the mother is unable to communicate to this little boy any questions tending to test his knowledge of an accountability to the Supreme Being, yet as a psychological fact, growing out of his mental condition, he would be incapable of communicating any evidence except such as. he saw. He would be incapable of manufacturing or inventing a falsehood as to the material facts, unless he saw them. In my opinion this would be a better test of the truth or at least as good a test of the truth as would be the belief of a man of mature age and clear understanding in his accountability to the Supreme Being. This of course breaks into the general rule of law as to the competency of witnesses, yet, all the facts in the case considered, I believe my view of the case to be the law, and that this case presents a well grounded exception to the general rule. My opinion is that the witness is competent; the very fact that ordinary ideas about things and events which he has not seen cannot be communicated to him is a better test of the credibility of what he is able to communicate by signs than would his mere belief in his accountability to the Supreme Being. The other class of ideas which he entertains would spring from the sensations of touch, taste, and smell. In this view of the case, I believe it is impossible for the boy to entertain ideas in regard to passing events unless he had actually witnessed them."

The boy was then examined, and, as interpreted by his mother, gave: material testimony in the cause.

We are of opinion that the admission of this testimony, under all

the circumstances, was erroneous. As the learned judge in the court
below said, the admission of such testimony broke into the general
rule of law as to the competency of witnesses. It appears to us to
transgress several well-settled rules; it was not shown that the child
had any intelligent idea whatever of the nature or sanctity of an
oath; on the contrary, it was shown by the testimony of his mother
that she could not explain to him its nature, or the consequence of
telling a falsehood while testifying as a witness. There is no case
which we can find in the books in which a person was permitted to
testify under such circumstances. A case of such gravity as this
would not, in our judgment, warrant the relaxation of the rule that
there must be some sanction under which the oath is taken before
the testimony could be properly admitted. Not only was it impossi-
ble to explain to him the nature of an oath, but it was quite as im-
possible, on his subsequent examination, to make him understand the
questions which were put to him; for example, his mother was asked:

*Question.* "Can you communicate to him now, so as to find out from him
what he was doing there?" [Meaning at the place where the murder took
place.] *Answer.* "No, sir; I cannot." *Q.* "How are you able to state that
he was there holding the horses?" *A.* "He marked it out as he did here.
He placed himself holding horses near the Chinaman's house." *Q.* "Explain
where the horses were while the men were dismounted during this killing.
Ask the boy that." *A.* "I cannot explain it to him in that way; all that he
can tell is that the men were killed, and who they were, and who did the
killing."

We are clearly of the opinion that such testimony should not have
been permitted to go to a jury in any cause, and least of all in a
capital case.

The constitution of the United States, and bill of rights, provide
that, "in all criminal cases, the accused has a right to be heard by
himself and counsel, to demand the nature and cause of the accusa-
tion,     *     *     *     and to meet the witnesses against him, face to face."
Of course, this language means that the accused shall have the right
to be confronted by the witnesses against him, under such circum-
stances as that their intelligence and truthfulness may be subjected
to the test of thorough examination and cross-examination. It is en-
tirely evident in this cause that the counsel for the accused, or the
accused themselves, could not by any possibility have intelligently
tested either the recollection or the truthfulness of this deaf and dumb
child, by reason of the inability of any one to either fully interpret
their questions or his answers.

We are unable to concur in the view of the learned judge in the
court below, that, "as a psychological fact, growing out of his mental
condition, he would be incapable of communicating any evidence, ex-
cept such as he saw. He would be incapable of manufacturing or
inventing falsehood as to material facts, because he could have no
idea of the facts unless he saw them.     *     *     *     I believe it is im-
possible for the boy to entertain ideas in regard to events, unless he

had actually witnessed them." In other words, the presiding judge was of opinion that the boy could not tell a lie, for the reason that he could only tell of such events as he had actually seen transpire. This was an assumption unwarranted by the facts. We see no reason why the imagination of that boy could not have been so developed as to have invented or fabricated a story of occurrences which had never taken place. Is it to be said that because a person is deaf and dumb that he wholly lacks imagination? We think not. Deaf and dumb persons have frequently, according to the experience of men, not only given evidence of strong imagination, but in several instances have been successful writers of fiction. It is no answer to this view to say that this child was uneducated; it only makes it more difficult to say to what extent his imagination may have been developed and may have acted.

We are therefore of opinion, for the reasons stated, that the court below erred in admitting the evidence of the deaf and dumb child, Luther Carey, as that of a competent witness.

We arrive at this conclusion with reluctance, as there is much reason to believe from an examination of the record that the defendants are guilty as charged. That fact, however, we cannot consider here. "A court inquiring after the regularity of proceedings never asks whether or not the defendant is guilty. A guilty man, when the proceedings are irregular, has the same right to escape from the grasp of the law as an innocent one; on the other hand, an innocent man has no rights in this respect which a guilty one has not." 1 Bish. Crim. Proc. § 92. The same authority in the following section adds: "The result is that one accused before the court has the same right to protest against the proceedings as to protest his innocence. And counsel who appear on his behalf have the same right, and are under the same obligation, to do the one as the other. * * * Human laws are meant merely to conserve the outward order of society, and a part of this order, not less essential than any other part, consists in pursuing the exact methods which the law has laid down in bringing criminals to justice. * * *" Id. § 93.

It is of the highest importance that, in so grave a case as the one under consideration, the exact methods which the law has laid down should be pursued with the greatest strictness.

For the reasons stated herein, the judgment of the court below must be reversed, and a new trial ordered.

AXTELL, C. J. I concur.

BRISTOL, J., *dissenting.* The appellants, Abel Duran and Aurelio Lora, were indicted jointly with Carlos Chaves, for the crime of murder in the first degree. Chaves, having been tried separately and convicted, Duran and Lora were afterwards, but at the same term, jointly tried, convicted, and sentenced to be executed. This case is here

on appeal. This court having rendered its decision reversing the judgment and remanding the cause for a new trial, I dissent therefrom for the reasons herein stated.

The learned judge, in rendering the opinion of this court, quoted only so much of the evidence relating to the competency of the deaf and dumb boy as a witness as relates to the inability of his mother as an interpreter of his gestures and signs to communicate to him any question that he could comprehend touching his understanding of the obligation of an oath or the consequences to him in case he should utter a falsehood. The ruling of the court below in admitting the statements of the boy, through his natural signs and gestures, was not based on that part of the evidence at all, except so far as the fact of his immaturity of age, his inexperience, and the impossibility of communicating any but the simplest ideas to his mind, rather strengthened the moral certainty that he could communicate only what he had actually seen. The murder was committed on Saturday evening about 8 o'clock, as the evidence by other witnesses conclusively shows. Other evidence on the examination of the boy on his *voir dire*, and addressed to the court, was received from his mother, as follows:

"*By the Court.* Do you know whether this little boy made any communication to any one in regard to this murder before it was known in the community that the murder had been committed? *Answer.* Yes, sir; he did to me *that Saturday night. By the Court.* Please explain that. *A.* He came into the house, and came to the room where I was. The child was very much excited and commenced hallooing, and when I looked around at him he was excited. I knew that something uncommon had happened, and he commenced showing me that somebody was stabbed, and making signs of a throat being cut by drawing his hand across his throat. He then commenced beating himself with a stick, and showed that shooting had been going on by pointing, as though he had a gun. He drew his hand across the back of his head and fell over, and was very much excited all the while. There was a soldier in the house, and I says to the soldier, 'Do you know what the child means? Something has happened, and he is trying to tell me about it.' The soldier said he did not know, without it was about a fight a couple of soldiers had at the post a few days before. The soldier looked at the child and pointed to himself, trying to tell him that it was about the fuss at the post; but the little boy pushed the soldier away, and pointed at *Duran,* [one of defendants,] who was sitting there on the end of the bench. [The Careys, parents of the boy, kept a public house.] I said to Duran, 'What have you been doing? The boy is telling something on you.' The child made signs, by putting his hand on the back of his head, and showing that they were Chinamen, by representing their long queues, and made signs that they would not put him in jail, because they were Chinamen, and it made no difference. He then put the stick under his arms, and commenced beating with both hands. [All this testimony objected to on behalf of defendants, objection overruled and exception taken by district attorney.] *Q.* When did you first hear of this murder? *A.* Not until next morning. *Q.* You say the child was very much excited that evening? Was his conduct something unusual? *A.* Yes, sir; I knew something serious had happened, but of course I could not then tell what it was. *Q.* How did Duran act when the little boy pointed at him after he pushed the soldier aside? *A.* Duran just sat there on the end of the bench.

He knew something had happened just as well as I did. *Q.* Did the little boy appear to be excited when he first came into the house? *A.* Yes, sir; he was very much excited. He called mam! mam! two or three times, and then went on trying to show me what had happened. I tried to pay no attention to him several times, but he would keep on, insisting that I should know what had happened. * * * *By the Court.* Did not this little boy on the other trial, [the trial of Carlos Chaves, one of the three jointly indicted,] in answer to the question put to you as interpreter, as to whether he knew the penalty he would incur if he told a falsehood, say in answer to that inquiry that he would be burned up? *A.* Yes, sir; when I made signs to him about his God then, and what would become of him if he told a lie, he understood me, and made signs that he would be burned up, but I cannot make him understand that now."

At a previous stage of the examination the mother had testified that the boy was between nine and ten years of age; that he was uneducated. "He knows the alphabet, but he cannot form words. He can spell ' dog ' and ' cat ' and ' boy,' and simple words like that; that is the extent of his education."

It was upon this evidence addressed to the court, and not to the jury, as to the mental condition of this deaf and dumb boy, and the true facts and circumstances of his first revelations to his mother of what he knew of the murder of the Chinamen, that the court below ruled as follows:

"This little boy has no education. I am inclined to believe that, notwithstanding the fact that the mother is unable to communicate to him any questions tending to test his knowledge of and accountability to the Supreme Being, yet as a psychological fact, growing out of his mental condition, he would be incapable of communicating any events, except such as he had seen. He would be incapable of manufacturing or inventing falsehood as to material facts, because he could have no idea of the facts unless he saw them. In my opinion, this would be a better test of the truth or at least as good a test of the truth as would be the belief of a man of mature age and clear understanding in his accountability to the Supreme Being. This, of course, breaks into the general rule of law as to the competency of witnesses. Yet, all the facts in the case considered, I belive my view of the case to be the law, and that this case presents a well-grounded exception to the general rule. My opinion is that the witness is competent. The very fact that the ordinary ideas about things and events which he has not seen cannot be communicated to him, is a better test of the credibility of what he is able to communicate by signs than would his mere belief in his accountability to the Supreme Being. The other classes of ideas which he entertains would spring from the sensations of touch, taste, and smell. In this view of the case I believe it to be impossible for the boy to entertain ideas in regard to passing events unless he had actually witnessed them."

To this ruling exceptions were duly taken on behalf of the defendants, and constitutes the ground of error on which this court has reversed the judgment.

The only evidence adduced on the trial in the lower court, whereby the defendants could be identified as having taken part in perpetrating the murder, is the evidence of this deaf and dumb boy. It can be seen from the record that to go to trial without this evidence must necessarily result in an acquittal. No one can read the entire testi-

mony adduced on the trial, and consider it carefully, in connection
with corroborating circumstances, without being profoundly im-
pressed with the fact that what the boy was able clearly to com-
municate immediately after the murder,—on the same evening it oc-
curred,—embracing the horrible details of the crime with wonderful
accuracy and precision as to time, place, persons, specific acts, blows,
shots, and attending circumstances, *was the truth*, with as high a de-
gree of moral certainty as is possible to be attained from evidence.
The very fact that the boy was unable by signs to make his mother
understand the facts as to the murder, and in a manner to identify
the tragedy, was proof positive that if the boy had not actually wit-
nessed it and gazed upon it with his own eyes it was a psychological
impossibility for any one to have communicated to him the minute
details of the crime so as to enable him to describe them with such
accuracy.

Courts will always take judicial notice of the well-known and uni-
form laws of nature. It would not be necessary, for instance, if the
fact became material on a trial, to prove that a body in the air of a
greater specific gravity than the air, and with no resistance to over-
come except that of the air, would certainly descend to the earth.
There are laws governing the human mind that are as well known
and uniform in their operation as is the law of gravitation. Every
sound human mind is endowed with that wonderful faculty or power
termed consciousness, whereby the mind is enabled to look in upon
itself and perceive its own successive sensations, perceptions and
emotions, as well as other mental phenomena, and the order in
which they occur. That sensation must precede perception, and that
both must precede consciousness thereof, are uniform laws of the hu-
man mind that are well known and understood in the common expe-
riences of mankind. The mind of this lad, uneducated in any deaf
and dumb language whereby ideas as to unseen passing events
could be communicated to him, was necessarily a blank as to any
minute details respecting the same. This was a fact, which, under
the clear and positive evidence as to his mental condition, the court
could take judicial notice of. If there was any room for doubt from
the examination of the boy on his *voir dire*, all doubt on the subject
must have been removed by the facts and corroborating circumstances
adduced on the trial.

The second day after the murder, and before the boy had any op-
portunity to visit the place of the tragedy after its occurrence, in
order to test his knowledge of the crime, signs were made to him to
lead on the trail of the men who committed the deed he was trying
to explain. He was put upon a horse; he took the lead; keeps con-
siderably in advance of the party following; struck the trail or tracks
of the horses which the murderers rode, and followed it on a circuit-
ous and out-of-the-way route, off from any road, through a bushy
and unfrequented part of the country, to the place where the murder

was committed. He led to the very house in which the three China-men had been killed. On looking in he expressed his astonishment by signs and actions at not finding the dead Chinamen, (they had been taken out and buried in the meantime.) He was unable to make any intelligible statement as to the details of the tragedy by mere signs or gestures, but with paper and pencil he very readily drew a rude plat of the house and grounds and objects in the imme-diate vicinity, the roads to and from the place, and its location with reference to Fort Bayard, that was clear and intelligible. On this plat he marked out the position of each of the defendants while in the act of killing the Chinamen, as also his own position holding the horses. He also designated on the plat the three Chinamen where they fell. With the aid of his plat he was able by signs and gestures to express very intelligently the manner in which the Chinamen were killed, and the part each defendant took in perpetrating the deed; each of the three defendants was so perfectly marked that he could easily identify them by signs. One was distinctly pock-marked, another had a very peculiar broken-down nose, and the other had a plain mark or line around his neck. The boy designated and identified him by making a circling motion around his own neck with his hand. It was evidently this motion when the boy was trying to tell his mother what had happened on the very night of the murder that she mistook for a sign that some person's throat had been cut in the presence of the child. It would seem that after killing the China-men and secreting the plunder the murderers abandoned the boy to get home, some two miles and a half distant, as best he could. He hastened home at once, and under great excitement endeavored by signs to tell his mother what had happened. In the light of all the evidence, including the limited mental capacity of the child and his inability to receive or to communicate ideas as to passing events, ex-cept as they came to him through the sensation of sight, it was im-possible for him to have imagined and fabricated the details of the tragedy with such wonderful accuracy and precision.

The presence of the boy at the scene of the murder is reasonably accounted for from the evidence of other witnesses. The defendants and the boy, with his parents, lived in the same town. The defend-ants owned saddle-horses; the boy was with the defendants a great deal; was very fond of riding on horseback, and often rode with the defendants; they evidently supposed the boy could not be a witness, as he was speechless.

The books nowhere furnish a precedent like this. If the law of evidence in no way opens the door for testimony of this kind, then all I have to say is that the law in this respect is certainly at fault, and the sooner it is changed, either by judicial precedent or by legisla-lation, the better. The sole object of every judicial investigation, upon evidence, is to ascertain the truth as to the issue involved. Being satisfied of the absolute truthfulness of this deaf and *dumb* boy's

communications as to the details of the murder, and who committed it, it is my opinion that if he cannot be considered competent as an ordinary witness, because he cannot be communicated with and made to understand the legal and technical obligations of an oath, then under the very extraordinary circumstances attending the case, his communications ought to have been considered as having been properly received as circumstantial evidence, proven by his mother, who understands them, in precisely the same manner as tracks or a trail leading to an identification of the murderers, might have been proven and received as competent evidence; and that it would have been proper for this court to have established a precedent of that kind.